IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **RICHARD ALLEN DUNFORD,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 1:21cv00007 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Richard Allen Dunford, ("Dunford"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Dunford protectively filed his application for DIB on July 10, 2018, alleging disability as of June 19, 2018, based on a herniated disc in his neck; arthritis; fainting spells; and migraines. (Record, ("R."), at 12, 178, 241.) The claim was denied initially and upon reconsideration. (R. at 93-95, 100-03, 105-07.) Dunford then requested a hearing before an administrative law judge, ("ALJ"). (R. at 108-09.) The ALJ held a hearing on August 18, 2020, at which Dunford was represented by counsel. (R. at 30-63.)

By decision dated September 17, 2020, the ALJ denied Dunford's claim. (R. at 12-24.) The ALJ found Dunford met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023. (R. at 14.) The ALJ found Dunford had not engaged in substantial gainful activity since his alleged onset date of June 19, 2018.[2] (R. at 14.) The ALJ determined that Dunford had severe impairments, namely cervical spine degenerative disc disease; hypotension; gastroesophageal reflux disease, ("GERD"); chronic obstructive pulmonary disease, ("COPD"), mild; allergies; and generalized osteoarthritis, but he found Dunford did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-17.)

---

[2] Therefore, Dunford must show he was disabled between June 19, 2018, the alleged onset date, and September 17, 2020, the date of the decision, to be eligible for benefits.

The ALJ found that Dunford had the residual functional capacity to perform sedentary[3] to light[4] work, except he could sit for six hours in an eight-hour workday; stand and/or walk for two hours each, totaling four hours in an eight-hour workday; lift/carry 20 pounds occasionally and 10 pounds frequently; frequently, but not constantly, reach, bilaterally; occasionally climb, kneel and crawl; he should avoid heights, hazards, fumes and work requiring operation of foot controls or overhead work; he should not be exposed to concentrated levels of respiratory irritants; and he had required the use of a cane for balance since it was prescribed in July 2020. (R. at 17.) The ALJ found that Dunford was unable to perform any past relevant work. (R. at 22.) Based on Dunford's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Dunford could perform, including the jobs of an assembler, a packer/stuffer and an inspector, all at the sedentary level of exertion. (R. at 23-24, 54-55.) Thus, the ALJ concluded that Dunford was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Dunford pursued his administrative appeals, (R. at 146-48), but the Appeals Council denied his request for review. (R. at 1-5.) Dunford then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §

---

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2021).

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

404.981 (2021). This case is before this court on Dunford's motion for summary judgment filed July 15, 2021, and the Commissioner's motion for summary judgment filed August 11, 2021.

## II. Facts[5]

Dunford was born in 1971, (R. at 152), which, at the time of his application and the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). He has an eighth-grade education[6] and past work experience as a construction worker. (R. at 34.) Dunford testified he is right-handed. (R. at 37.) He testified he had back, neck and knee pain, restless leg syndrome, high blood pressure and migraine headaches, for which he took hydrocodone, gabapentin, Zanaflex, trazodone, melatonin, Lisinopril and metoprolol, all of which made him drowsy. (R. at 43-44, 49-50.) Dunford estimated he spent about six hours sleeping during a typical day. (R. at 50.) He stated the gabapentin helped his restless leg syndrome, and his pain medications sometimes helped, but sometimes did not touch his pain. (R. at 53.) Dunford testified Dr. McConnell had prescribed a cane for him in July 2020, which he used all the time, both inside and outside of the house, stating, "I can't walk without it. I stagger like I'm drunk." (R. at 46-47, 50.) He said the cane helped prevent him from falling. (R. at 47.) However, Dunford stated he had begun using a family member's cane in May or June 2020. (R. at 47.) He testified his knees constantly popped and cracked, and they hurt to stand on them. (R. at 47.) Dunford

---

[5] Because Dunford does not challenge the ALJ's findings with regard to his mental impairments or limitations, this Memorandum Opinion does not contain treatment notes or other evidence pertaining to the same.

[6] Under the regulations, a claimant with a seventh- through eleventh-grade formal education generally is considered to have a "limited education," which means he has ability in reasoning, arithmetic and language skills, but not enough to allow him to do most of the more complex job duties needed in semi-skilled or skilled jobs. *See* 20 C.F.R. § 404.1564(b)(3) (2021).

testified he fell from a building in 1998, fracturing multiple bones, including a bone in his left wrist, as well as dislocating every bone in his left wrist. (R. at 48.) He underwent immediate wrist surgery, and he worked several years after it healed. (R. at 48.) However, Dunford testified his wrist continued to worsen, including losing grip, and he stated it was weaker than it was a couple of years ago. (R. at 48.) He testified he did not have difficulty picking up small objects, but he had difficulty holding onto them. (R. at 49.) Dunford stated he could barely turn his head, and if he did, it would pop and shoot pain straight up through the back of his head, inducing a migraine headache. (R. at 45.) He said his neck pain was constant. (R. at 45.) Dunford testified his low back pain was similar, stating if he tried to bend over, it felt like the back of his legs were on fire, and this radiated all the way to the bottom of his feet. (R. at 46.) He stated he had to walk lightly, as jarring felt like he was stepping on glass. (R. at 46.) Dunford stated sitting eased the pain a little bit. (R. at 46.) He said it hurt to stand, and he could not stand for more than five minutes at a time. (R. at 46.)

Dunford described a typical day as sitting around and watching television, as well as going out on his porch and watching the birds or watching the cars go by. (R. at 49.) He testified he and his wife mostly stayed to themselves, but he kept in touch with some people by telephone. (R. at 52-53.) He denied being able to do any type of housework or yardwork. (R. at 51-52.) Dunford testified he did not drive, as his driver's license was suspended about a year previously for lack of insurance. (R. at 52.) He stated a neighbor got their groceries for them. (R. at 53.) In his most recent Function Report, dated May 29, 2019, Dunford indicated he sat around from the time he woke up until he went to bed. (R. at 230.) He reported no difficulty with personal care, and he stated he prepared meals daily. (R. at 231-32.) Dunford reported he did not perform any house or yard work because he could not stand or walk for a long period of time. (R. at 232-33.) He stated he did not go outside often, as he could not

walk very well, and he did not go out alone for fear of falling. (R. at 233.) He stated he watched television and sat on the porch with his wife. (R. at 234.) Dunford indicated he could not lift more than 25 pounds; he could not squat, climb stairs, bend, stand for long periods of time, walk very far or kneel. (R. at 235.) He estimated he could walk no more than 20 feet before having to stop and rest for at least 30 minutes. (R. at 235.) Dunford stated he had been using a cane at all times for about four months, but this was not prescribed by a doctor. (R. at 236.)

Vocational expert, John Newman, testified at Dunford's August 18, 2020, hearing. Newman testified that an individual of Dunford's age, education and work history who could perform sedentary to light work, except he could sit for six hours in an eight-hour workday; stand and/or walk for two hours each, totaling four hours in an eight-hour workday; lift/carry 20 pounds occasionally and 10 pounds frequently, but not constantly reach, bilaterally; occasionally climb, kneel and crawl; should avoid heights, hazards, fumes and work requiring operation of foot controls or overhead work; and who should not be exposed to concentrated levels of respiratory irritants or uneven terrain could perform the sedentary jobs of an assembler, a packer/stuffer and an inspector. (R. at 54-55.) The vocational expert further testified that, if the same individual required the use of a cane for balance when walking, it would preclude sedentary work. (R. at 58-60.)

In rendering his decision, the ALJ reviewed medical records from Johnston Memorial Hospital, ("Johnston Memorial"); Dr. James J. McConnell, M.D.; Smyth County Community Hospital; Dr. William Humphries, M.D.; Advanced Surgical Associates; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and Dr. Robert McGuffin, M.D., a state agency physician.

Dunford saw his primary care physician, Dr. James J. McConnell, M.D., on June 7, 2018, rating his back pain as a seven on a 10-point scale. (R. at 328.) He also endorsed chest pain and tightness, shortness of breath, shoulder pain and numbness or tingling sensations in the arms, as well as joint stiffness or swelling, muscle pain or cramps and difficulty walking. (R. at 329.) Nonetheless, he denied loss of balance. (R. at 329.) Dunford reported wanting to find a job closer to home. (R. at 328.) On physical examination, there was no abnormality of the extremities or joints, including no tenderness or swelling, as well as no clubbing, cyanosis or edema. (R. at 330.) There also was no costovertebral angle, ("CVA"), tenderness, no shoulder hump, no scoliosis and no back tenderness. (R. at 330.) Dr. McConnell's diagnoses included cervical degenerative disc disease; chronic neck pain; and chronic back pain. (R. at 330.) He prescribed Dunford pain medication – hydrocodone 10 mg–acetaminophen 325 mg tablets, he continued to monitor his conditions, and he instructed Dunford in diet and exercise. (R. at 330-31.) On July 6, 2018, Dunford rated his neck pain as an eight on a 10-point scale, stating it radiated into his left shoulder. (R. at 324.) He reported doing better since not working, and they discussed tapering off pain medications. (R. at 324.) He said his last migraine was about a month previously. (R. at 326.) Dunford's examination was the same, except he exhibited lumbar tenderness. (R. at 326.) Dr. McConnell added knee pain to Dunford's diagnoses, and he also prescribed gabapentin in addition to hydrocodone. (R. at 326-27.)

Dunford presented to the emergency department at Smyth County Community Hospital on July 20, 2018, after passing out. (R. at 389.) An electrocardiogram, ("ECG"), yielded borderline results. (R. at 397-98.) However, a CT scan of the head showed no acute intracranial abnormality. (R. at 394.) Although Dunford reported a headache, he also stated he had not taken his prescribed medications for two to three months because he could not afford them. (R. at 399-400.) Dunford was discharged

home in stable condition with instructions to follow up with his primary care physician in two to three days for a recheck and possible referral to a neurologist for syncope if the symptoms persisted. (R. at 401, 415, 428.) He also was instructed to rest, not get overheated, increased fluid intake and use his prescribed pain medication, Lortab (hydrocodone-acetaminophen), as needed. (R. at 426.)

Dunford returned to Dr. McConnell on September 6, 2018, with complaints of left hip pain for one week, which he rated as a 10 on a 10-point scale. (R. at 450.) He said it was aggravated by various movements and relieved by rest, medications and sitting. (R. at 450.) Dunford also reported having passed out twice and not sleeping well. (R. at 450.) On examination, he had no extremity or joint abnormality, including no tenderness or swelling and no clubbing, cyanosis or edema. (R. at 452.) There also was no CVA tenderness, no shoulder hump, no scoliosis and no back tenderness. (R. at 452.) Dr. McConnell added left hip pain to Dunford's diagnoses, and he ordered x-rays. (R. at 453.) In relation to his syncopal episodes, he instructed Dunford to control his blood pressure. (R. at 453.) Dr. McConnell continued Dunford on medications. (R. at 452-53.) Hip x-rays from that day showed no bony abnormalities in the left hip, but suspicion of very early osteoarthritic change in the right hip. (R. at 380.) On October 4, 2018, Dunford's hypertensive symptoms had not changed, despite Dunford's report that he had been compliant with his medications. (R. at 446.) He rated his hip, back and neck pain as a seven on a 10-point scale and his left knee pain as a 10. (R. at 446.) Dunford reported he passed out again, hitting his head and right shoulder on a screen door. (R. at 446.) Examination of the extremities, joints and back remained normal. (R. at 448.) Dr. McConnell noted Dunford's hypertension was well-controlled. (R. at 448.) He noted the syncope might be related to orthostatic blood pressure change that might be related to Zanaflex, which he opted to monitor. (R. at 449.) Dunford's medications were continued. (R. at 448-49.) On November 6, 2018, despite Dunford's complaints

of bilateral elbow pain and weather-related joint pain, examination showed no extremity or joint tenderness, swelling, clubbing, cyanosis or edema, as well as no CVA tenderness, no shoulder hump, scoliosis or back tenderness. (R. at 442, 444.) Dr. McConnell, again, found Dunford's hypertension well-controlled; he found his cervical degenerative disc disease was increased due to the weather; he diagnosed tendinitis of the right elbow, which he noted was worse with weather changes; and he noted Dunford had not had a syncopal episode since decreasing his blood pressure medication. (R. at 444-45.)

Over the next three months, Dunford continued to see Dr. McConnell monthly for regular follow ups. Over this time, he complained of neck, knee, radiating back and elbow pain, as well as left hand swelling and rectal bleeding. (R. at 499, 504, 506.) In December 2018, physical examination revealed joint tenderness, but no clubbing, cyanosis or edema of the extremities; and there was tenderness in the lower spine and sciatic areas, but no CVA tenderness, no shoulder hump and no scoliosis. (R. at 506.) A urine drug screen on this day was positive for tetrahydrocannabinol, ("THC"), and oxycodone but negative for Dunford's prescribed pain medication – hydrocodone. (R. at 484-85.) In January 2019, Dunford reported a history of breaking his left wrist in the late 1990s after falling 20 feet off a building which required surgical repair. (R. at 499.) Despite complaining of left hand swelling beginning the prior night, examination was normal except for epigastric tenderness. (R. at 499, 501.) An esophagogastroduodenoscopy, ("EGD"), and colonoscopy were scheduled. (R. at 502.) In February 2019, Dunford reported feeling awful since being exposed to black mold in his home, and he stated his back and joint pain were giving him "a fit," especially with activity. (R. at 495.) Nonetheless, he reported Tylenol seemed to help, and his examination was normal except for epigastric tenderness and an elevated blood pressure reading of 140/86. (R. at 497.) Over this time, Dr. McConnell continued Dunford on medications.

Dunford saw Dr. William Humphries, M.D., for a consultative examination, at the request of Virginia Department of Rehabilitative Services, on January 9, 2019. (R. at 455-59.) Dunford reported the fall he sustained in the late 1990s, as well as a low back injury four years later. (R. at 455.) He said he had significant low back pain that radiated into the entire back since that time, but for which he had not undergone surgery. (R. at 455.) Dunford reported constant back pain, worsened with bending, lifting or prolonged standing and walking, and he noted an inability to walk more than 15 feet on a good day on level ground without stopping. (R. at 455.) He also reported having knee pain for about two years, the right side being worse than the left, and worse with standing and walking; elbow pain for about three years; neck pain for about 15 years after being injured in a fall 15 years previously, but without fracture; and having three fainting episodes of unknown etiology over the previous seven months. (R. at 455.) Dunford's blood pressure readings were 149/97 and 144/106 at that time; he moved on and off the table slowly, guarding his back movement using his hands; there was slightly increased anteroposterior, ("AP"), diameter of the chest; his neck was tender to palpation posteriorly, including the trapezii; his back was tender to palpation in the superior thoracic and entire lumbar regions without spasm; there was mild dorsal kyphosis; and straight leg raise testing was negative to 90 degrees seated; the upper extremity joints revealed tenderness to palpation of the shoulders, elbows and left wrist; there was mild enlargement of some of the metacarpophalangeal, ("MCP"), and interphalangeal, ("IP"), joints, but the hands were nontender; the lower extremity joints had no significant deformity, but there was mild synovial thickening of the knee regions and mild enlargement of some of the IP joints; knees were tender to palpation; there was no motor of sensory loss in the extremities; grip was 5/5; radial, median and ulnar nerve function was intact; Tinel's sign was negative; there was no atrophy and no asymmetric muscle wasting, but he did have moderately symmetrically diminished muscle mass in all four extremities; deep tendon reflexes were absent in the right triceps, but otherwise,

1+ and equal in the upper extremities; there was occasional fine tremor in the outstretched hands; Romberg's sign was negative; fine manipulation was performed adequately; gait was moderately antalgic on the right due to knee and lumbar discomfort; there was give way on toe stand attempts and briefly heel stand; and he did not require ambulation aid. (R. at 456-57.)

Dr. Humphries diagnosed Dunford with hypertension; weight loss of unknown etiology; chronic thoracic-lumbar strain with possible degenerative joint disease; degenerative joint disease of the cervical spine; degenerative joint disease of the elbows, hands and feet; syncopal episodes of unknown etiology; and mild COPD. (R. at 457.) He opined Dunford could sit for six hours in an eight-hour workday; stand for two hours in an eight-hour workday; walk for two hours in an eight-hour workday; lift 20 pounds occasionally and 10 pounds frequently; occasionally climb, kneel and crawl; avoid heights, hazards and fumes; he could not operate foot controls or perform overhead work; and he had no restriction on stooping or crouching. (R. at 458.)

Dunford saw Dr. James C. Zwanch, M.D., at Advanced Surgical Associates, for a consultation regarding rectal bleeding, acid reflux and weight loss on January 21, 2019. (R. at 464.) The only finding on examination was grade 1 hemorrhoids. (R. at 464.) Dunford's extremities were without clubbing, cyanosis or edema. (R. at 464.) Dr. Zwanch diagnosed hematochezia, and he scheduled an EGD/colonoscopy, which was performed on February 2, 2019, and showed rectal bleeding, mild gastritis, a hiatal hernia and hemorrhoids. (R. at 464, 479-80.) When Dunford returned to Dr. Zwanch on February 22, 2019, a physical examination was completely normal. (R. at 462.) Although Dr. Zwanch suspected a gallbladder issue, a right upper quadrant ultrasound showed no abnormality. (R. at 462, 478.)

On February 7, 2019, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a physical residual functional capacity assessment in connection with the initial determination of Dunford's claim. (R. at 70-72.) He opined Dunford could occasionally lift and/or carry items weighing up to 25 pounds both occasionally and frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push/pull up to the amounts shown for lifting/carrying; frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; avoid concentrated exposure to extreme cold and vibration; and avoid even moderate exposure to hazards, such as machinery and heights. (R. at 71-72.) Dr. Beazley imposed no manipulative, visual or communicative limitations. (R. at 71-72.) In support of his opinion, Dr. Beazley noted Dunford's history of abnormal spine imaging; joint abnormalities; tenderness to palpation and active range of motion; and gait disturbance. (R. at 71-72.) However, he also noted Dunford's full strength, being neurologically intact, having no assistive device requirement and his history of positive drug screens. (R. at 71-72.)

Dunford continued to treat monthly with Dr. McConnell from March through July 2019, reporting complaints of joint pain, chest pain and stiffness, back pain, difficulty breathing and a productive cough, headaches, elevated blood pressure, neck pain, arm and hand numbness when holding them up and loss of control of the arms and hands. (R. at 487, 491, 493, 579, 581, 583.) Dunford believed the chest pain, breathing difficulty and cough were related to the black mold in his home. (R. at 487, 491.) Chest and rib x-rays were negative. (R. at 475-77.) In June 2019, he reported he felt better since moving to a new home. (R. at 583.) In March 2019, Dunford stated the cold weather affected his joints, and, otherwise, he was doing "pretty good." (R. at 491.) In April 2019, he rated his average back pain as a seven on a 10-point scale, and he stated it was aggravated by most activities and cold

-12-

weather and improved with changing positions, heat, medication, rest, use of pillows and lying flat. (R. at 487.) He denied any recent falls, and he said he did not use any assistive devices. (R. at 487.) In June 2019, Dunford reported "doing great" except for keeping a headache all the time. (R. at 583.) In July 2019, he reported improvement of back and neck pain with medication, stating it reduced it from a 10 to a six. (R. at 579.) He denied medication side effects and stated it promoted activity. (R. at 579.) Dunford admitted to marijuana use. (R. at 579.) A drug screen was positive for THC and oxycodone but negative for Dunford's prescribed pain medication – hydrocodone. (R. at 665-66.) Over this time, Dunford's physical examinations showed tenderness to the costochondral junction and anterior chest wall, CVA tenderness on occasion, neck muscle tenderness, and some increased blood pressure readings. (R. at 489, 493, 581, 585.) However, the majority of findings related to his back, extremities and joints were normal, including no tenderness, swelling, cyanosis, clubbing or edema. (R. at 487, 493, 581, 585.) Although Dr. McConnell ordered MRIs of the lumbar and cervical spine in April 2019, this was based on Dunford's statement that his disability lawyer had requested them. (R. at 489.) He also ordered a cervical spine MRI in July 2019 based on radicular symptoms into both arms from Dunford's cervical degenerative disc disease. (R. at 581.)

On July 8, 2019, Dr. Robert McGuffin, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Dunford could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull the same amounts for lifting/carrying; frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes and scaffolds; he must avoid concentrated exposure to extreme cold and vibration; and he must avoid all exposure to hazards, such as machinery and heights. (R. at 86-

88.) Dr. McGuffin found Dunford had no manipulative, visual or communicative limitations. (R. at 87.) He supported his findings by noting a 2015 cervical x-ray showing severe degenerative disease at the C4-C5 level; complaints of chronic pain in the lumbar spine, shoulders and knees; and reports of syncopal episodes. (R. at 86-87.)

Dunford continued monthly primary care treatment with Dr. McConnell throughout 2019. From August to December 2019, Dunford complained of headaches, back and neck pain, constant knee pain, worsened hypertensive symptoms, chest pain, a shooting sensation up and down his legs to his lower back when he placed a case of drinks in his refrigerator, blacking out twice in November 2019, left shoulder and left elbow pain and feeling like his muscle was ripping when he raised his left arm. (R. at 555, 561, 566, 571, 575.) In August 2019, Dunford had tenderness in both knees, but no clubbing, cyanosis or edema; and he had neck and lumbar spine tenderness. (R. at 577.) Right knee x-rays showed no significant abnormality. (R. at 684.) Lumbar spine x-rays showed mild narrowing at the L4-L5 disc space and questionable minimal narrowing at the L3-L4 disc space, and cervical spine x-rays showed degenerative changes most pronounced at the C4-C5 disc space. (R. at 681, 683.) By early September 2019, he exhibited epigastric tenderness, but all other examination findings were completely normal. (R. at 573.) On September 30, 2019, Dunford continued to have epigastric tenderness, and examination further revealed lumbar spine tenderness. (R. at 568.) Otherwise, findings were normal. (R. at 568.) On October 31, 2019, despite rating his back pain as a 10, the only finding on examination was tenderness to the lower paravertebral muscles. (R. at 561, 563.) A drug screen was positive for THC. (R. at 659.) This screen was negative for all opiates despite Dunford's ongoing prescription for hydrocodone. (R. at 569.) By December 2019, Dunford's physical examination was completely normal, and Dr. McConnell discussed alternatives to long-term opioid therapy for chronic pain. (R.

at 558.)

On January 3, 2020, Dunford reported left shoulder pain, which he described as feeling like a hot poker sticking through it when lying on it, and he reported weather-related back pain. (R. at 550.) His blood pressure was 174/110. (R. at 552.) Physical examination was completely normal. (R. at 552.) At Dunford's request, Dr. McConnell scheduled an orthopedic consult for his shoulder. (R. at 553.) On February 4, 2020, Dunford reported pain medication decreased his pain from a 10 to a seven, but it only helped for a few hours. (R. at 545.) However, he stated he would not be able to do anything without medication. (R. at 545.) He stated lifting more than 10 pounds caused neck pain, and he stated he could not bend his knees or kneel down, he could not lift or pick anything up weighing more than 10 pounds without having back and neck pain. (R. at 545.) Dunford stated he had left wrist pain, decreased grip in the left hand and dropping objects. (R. at 545.) He stated his pain was distracting. (R. at 545.) Dunford reported increased pain with walking. (R. at 545.) Dr. McConnell placed the following restrictions on Dunford: occasional lifting of up to 10 pounds; occasional carrying of up to 10 pounds for small distances; sitting for a total of eight hours, but for one and a half hours without interruption; standing for a total of four to five hours, but for 15 minutes without interruption; walking for a total of three hours, but for five minutes without interruption; occasional reaching with the left hand, except overhead; and he must use a cane for balance when going outside, but he can carry small objects in the free hand. (R. at 545.) Dunford's blood pressure was 130/82. (R. at 547.) Nonetheless, his physical examination, again, was completely normal. (R. at 547-48.) Dr. McConnell ordered various x-rays, and he continued Dunford's medications. (R. at 548-49.) A drug screen from this day was positive for THC and oxycodone. (R. at 652.) Again, Dunford's prescribed pain medication contained hydrocodone, for which he tested negative. (R. at 652.)

On February 5, 2020, Dr. McConnell completed a Clinical Assessment Of Pain, opining Dunford's pain was distracting to the adequate performance of daily activities or work; that physical activity, such as walking, standing and bending greatly increased his pain, causing abandonment of tasks related to daily activities or work; that medication would severely limit his effectiveness in the workplace due to distraction, inattention, drowsiness, etc.; and without medication, Dunford would not be able to do anything. (R. at 516.) At no point in Dr. McConnell's notes does he ever recognize that Dunford continues to test negative for his prescribed pain medication and positive for narcotic pain medicine he is not prescribed. The same day, Dr. McConnell also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), opining Dunford could occasionally lift and carry items weighing up to 10 pounds, but never any more than that; sit for a total of eight hours in an eight-hour workday, but for only an hour and a half at a time; stand for a total of five hours in an eight-hour workday, but for only 15 minutes at a time; and walk for a total of three hours in an eight-hour workday, but for only five minutes at a time; he required a cane for balance when going outside, but the use of a cane was not medically necessary; he could use his free hand to carry small objects while using the cane; he could frequently use his right hand for reaching in all directions, handling, fingering, feeling, pushing and pulling; he could rarely use the left hand for reaching overhead; he could occasionally use the left hand for reaching in all other directions; and he could frequently use the left hand for handling, fingering, feeling, pushing and pulling; he could frequently use both feet for the operation of foot controls; he could frequently climb ramps; occasionally climb stairs; rarely balance; and never climb ladders or scaffolds, stoop, kneel, crouch or crawl; he could occasionally operate a motor vehicle, work around dust, odors, fumes, pulmonary irritants, extreme heat and loud noise; he could rarely work around humidity and wetness and extreme cold; and he could never work around unprotected heights, moving mechanical parts and vibrations. (R. at 517-21.) Dr. McConnell opined

-16-

Dunford would miss 15 workdays in an average month due to the cumulative impact of his problems. (R. at 521.)

Cervical spine x-rays, dated February 6, 2020, showed unchanged, moderate degenerative disc disease at the C4-C5 disc space; bilateral ankle x-rays were negative; lumbar spine and bilateral shoulder x-rays were normal; x-rays of the right wrist showed no pathologic appearing bony defects or obvious displaced fracture, deformities or dislocations, and there was no joint space effusion; x-rays of the left wrist showed advanced degenerative related changes versus post-traumatic/remote fracture deformity, and a correlation with clinical history was recommended; left elbow x-rays showed degenerative changes, but no acute osseous abnormalities; right elbow x-rays showed no osseous abnormalities; and x-rays of both hips showed minor right hip degenerative changes, but no acute osseous abnormalities. (R. at 668-79.)

Dunford continued treating with Dr. McConnell through July 2020, reporting hand pain, lower back pain, elevated blood pressure, a burning sensation in his lower back that radiated down both legs when bending over, migraine headaches, right knee pain and buckling, neck soreness, shoulder pain, fatigue after 10 minutes of activity requiring him to sit down and catch his breath and an inability to breathe outside. (R. at 522, 524, 530, 534, 538, 542.) In March 2020, although Dunford complained of hand pain and lower back pain, he stated he had been digging up a septic system the previous day. (R. at 542.) By April 2020, he denied much lower back pain at that time, but he noted the burning sensation with bending. (R. at 538.) A physical examination, however, yielded entirely normal findings. (R. at 538.) In May 2020, despite Dunford's complaints of right knee pain and buckling, examination findings remained normal. (R. at 536.) By early June 2020, Dunford reported having a better month, overall, and despite complaints of soreness, he stated

-17-

he had been trimming bushes. (R. at 532.) Two physical examinations in June 2020, remained normal, except for some lumbar spine tenderness. (R. at 528, 532.) In July 2020, Dunford reported his neck was sore from doing dishes, and he was sore from trimming bushes again. (R. at 522, 524.) He requested a cane from Dr. McConnell because he was "falling into stuff." (R. at 522.) Otherwise, Dunford reported doing "pretty good." (R. at 522.) He stated he wanted to quit smoking[7] and that his insurance would pay for nicotine patches. (R. at 522.) Physical examination was normal, except for lumbar spinal tenderness. (R. at 524.) On July 28, 2020, Dr. McConnell prescribed a cane for balance when walking based on Dunford's degenerative disc disease of the lumbar spine and his degenerative joint disease of the lumbar spine and knees. (R. at 594.) He continued to prescribe Dunford medications over this time.

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is

---

[7] Dunford reported smoking three quarters of a pack of cigarettes daily. (R. at 523.)

unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Dunford argues the ALJ erred by improperly determining he had the residual functional capacity to perform light work. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) He also argues the ALJ erred by failing to designate and evaluate his case as a borderline age situation. (Plaintiff's Brief at 6-8.) Lastly, Dunford argues the ALJ erred in finding he had the residual functional capacity to perform sedentary work, given his severe hand and wrist limitations. (Plaintiff's Brief at 8-9.)

As stated above, the ALJ found Dunford had the residual functional capacity

to perform sedentary to light work, except, among other things, he could sit six hours in an eight-hour workday; stand and/or walk two hours each in an eight-hour workday; and lift/carry up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 17.) Dunford argues the ALJ erred by finding he could perform light work when he limited him to a total of four hours of standing and/or walking in an eight-hour workday, as the minimum amount of standing and/or walking required by the light exertional level is six hours. The regulation defining light work states, in relevant part, as follows: "Light work involves … a good deal of walking or standing … ." 20 C.F.R. § 404.1567(b). While the regulation itself does not define "a good deal of walking or standing," the Social Security Administration, ("SSA"), has explained that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling, ("S.S.R."), 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). However, here, the ALJ did not find, either in his residual functional capacity finding or in the dispositive hypothetical question to the vocational expert, that Dunford remained capable of performing *the full range* of light work. (R. at 17, 54-55.) Instead, the ALJ found Dunford could perform a reduced range of light work, i.e., jobs entailing a maximum of only four hours of standing and/or walking in a workday. (R. at 17.) Therefore, I find that Dunford's argument that he cannot perform light work because he can only stand and/or walk a total of four hours in a workday is based on the faulty premise that light work requires six hours of standing and/or walking in an eight-hour workday.

Dunford also argues the ALJ erred by failing to designate and evaluate his claim as a borderline age situation. I am not persuaded by this argument for the following reasons. The Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, ("Grids"), contain four age categories: (1) a "younger person" (under age 50); (2) a "person closely approaching advanced age" (age 50-

-20-

54); (3) a "person of advanced age" (age 55 or older); and (4) a "person close to retirement" (age 60 or older). *See* 20 C.F.R. § 404.1563. "An ALJ must consider a claimant's age category from the alleged disability onset date until the date the ALJ announced his decision." *See Brown v. Colvin*, 2014 WL 1658751, at *3 (W.D. N.C. Apr. 25, 2014) (citations omitted). In situations where the claimant's age is on the borderline of a higher age category, the Commissioner does not apply the age categories mechanically and may apply the higher category. *See* 20 C.F.R. § 404.1563(b); *see also Pickett v. Astrue*, 895 F. Supp. 2d 720, 724 (E.D. Va. 2012). As the regulations explain:

> If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). Thus, in borderline age situations, the ALJ must decide whether to apply the higher age category or the claimant's actual age category. *See* 20 C.F.R. § 404.1563(b). The SSA, through the Hearings, Appeals, and Litigation Law Manual, ("HALLEX"), at Section I-2-2-42, offers guidance for determining whether a borderline age situation exists. To identify borderline age situations when making disability determinations, adjudicators are to apply a two-part test: (1) to determine whether the claimant's age is within a few days or a few months of the next higher age category; and (2) to determine whether the higher age category would result in a finding of "disabled" instead of "not disabled." If the answer to both questions is "yes," a borderline age situation exists, and the ALJ must decide whether it is more appropriate to use the higher age category or the claimant's chronological age. *See* HALLEX I-2-2-42; *see also Yates v. Colvin*, 2015 WL 5158739, at *7 (W.D. Va. Sept. 2, 2015). In addition, HALLEX I-2-2-42 requires that the ALJ explain in the decision that he considered the borderline age situation, state whether he applied the higher age category or the chronological age and note

-21-

the specific factors he considered.

It is well-settled that an ALJ must determine whether a claimant became disabled during the relevant period to the claim at issue. Likewise, an ALJ must consider a claimant's age during the relevant period. In determining whether a borderline age situation exists here, the court first must determine whether it is the date of the ALJ's decision or the date last insured that marks the end of the relevant period. Dunford contends his age should be calculated from his date last insured, December 31, 2023, which was more than three years after the date of the ALJ's decision, and at which time he would be 52, making him a person closely approaching advanced age. This contention fails for a couple of reasons. First, the concept of a borderline age situation entails an individual whose chronological age is within a few days or a few months of attaining an age that would place them in the next higher age category. Using Dunford's date last insured, that simply is not the case, as his chronological age at that time, 52 years old, would have placed him in the next higher age category of a person closely approaching advanced age for at least two years, far more than the "few days" or "few months" contemplated in borderline age situations. Second, courts have held that in the circumstances of this case, it is the date of the ALJ's decision from which to calculate a claimant's age. *See Pittard v. Berryhill*, 2018 WL 4677831, at *13 n.10 (E.D. Va. June 8, 2018),[8] (citing *Woods v. Colvin*, 218 F. Supp. 3d 204, 208 (W.D. N.Y. 2016)) (finding the date of the ALJ's decision, not the date last insured, was the proper date to use in determining the claimant's age category, when the decision predated the date last insured). In other words, when the date of the decision predates the date last insured, it is the date of the decision that marks the end of the relevant period. *See Finney v. Colvin*, 637 F. App'x 711, 719 (4th Cir. 2016) (King J., dissenting). At the time of

---

[8] *Report and recommendation adopted by* 2018 WL 4219193 (E.D. Va. Sept. 5, 2018).

the ALJ's decision, Dunford had turned 49 years old only two months previously, classifying him as a younger person under 20 C.F.R. § 404.1563(c). He, therefore, was 10 months shy of becoming a person closely approaching advanced age. The SSA has explained that, while it does not have a "more precise programmatic definition for the phrase 'within a few days to a few months[,]' it defines the term "a few" using its "ordinary meaning, a small number. Consider a few days to a few months to mean a period not to exceed six months." Program Operations Manual System, ("POMS"), DI 25015.006(B), ssa.gov/poms.nsf/lnx/0425015006 (effective date July 6, 2017).

Likewise, district courts within the Fourth Circuit have routinely held that a borderline age situation exists when the claimant is less than six months away from the next age category. *See Pickett*, 895 F. Supp. 2d at 724 (holding that an individual three months and 24 days from an older age category is of a borderline age); *Horne v. Berryhill*, 2017 WL 1505423, at *9 (D. S.C. Apr. 24, 2017) (finding that a clear borderline age situation existed when the plaintiff was five months away from turning 50 at the time of the ALJ's decision), *report and recommendation adopted by* 2017 WL 1519843 (D. S.C. Apr. 27, 2017); *Arnett v. Berryhill*, 2017 WL 1659060, at *4 (W.D. N.C. Apr. 4, 2017) (claimant presented borderline age situation when claimant was approximately three months away from next age category), *report and recommendation adopted by* 2017 WL 1552334 (W.D. N.C. Apr. 27, 2017); *Tanner v. Colvin*, 2016 WL 626493, at *5 (E.D. N.C. Jan. 26, 2016) (borderline age situation at four months), *report and recommendation adopted by* 2016 WL 617431 (E.D. N.C. Feb. 16, 2016); *Campbell v. Colvin*; 2015 WL 8484457, at *3 (M.D. N.C. Dec. 9, 2015) (holding that an individual slightly less than six months from an older age category is of borderline age); *Brown*, 2014 WL 1658751, at *4 (holding that an individual five months and nine days from an older category is of borderline age). Here, because Dunford was 10 months from the next

higher age category at the time of the ALJ's decision, the answer to the first part of the two-part test is "no," and the analysis need not procced any further. That being the case, I find the ALJ did not err by failing to designate and evaluate Dunford's claim as a borderline age situation.

Under these circumstances, even assuming Dunford had a residual functional capacity for only sedentary work, given his chronological age of 49 at the time of the ALJ's decision; his past relevant work as a construction worker, which was classified as semi-skilled by the vocational expert with no transferable skills; and his limited education, Rule 201.19 would direct a finding of "not disabled" under the Grids.

Lastly, Dunford argues the ALJ erred by finding he could perform sedentary work, given his hand limitations and his use of a cane due to knee pain. In particular, he argues his loss of grip in his left hand and his use of a cane due to knee pain prevent the good, bilateral hand usage required to perform most unskilled, sedentary jobs.[9] I am not persuaded by Dunford's argument. First, as noted by the Commissioner, Dunford's argument is based on his subjective allegations of wrist pain and loss of grip when attempting to hold small objects, which he related back to a fractured wrist in 1998. However, as the ALJ stated in his decision, the record reflects largely conservative medical treatment of Dunford's pain symptoms, and the medical evidence does not support a finding of disability based on the clinical findings and the totality of the evidence. (R. at 22.) First, the treatment notes reveal

_____

[9] According to S.S.R. 96-9p, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." 1996 WL 374185, at *8 (July 2, 1996). Any "*significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." S.S.R. 96-9p, 1996 WL 374185, at *8 (emphasis in original).

that he complained of hand and/or wrist issues, specifically, on three occasions – in January 2019, February 2020 and March 2020. In January 2019, he reported left hand swelling beginning the prior night, but a physical examination revealed no abnormal findings. (R. at 499, 501.) Dr. McConnell continued Dunford's medications. (R. at 502.) In February 2020, Dunford complained of left wrist pain and decreased grip in left hand and dropping objects. (R. at 545.) Nonetheless, a physical examination was normal, including no tenderness or swelling of the joints and no clubbing, cyanosis or edema of the extremities. (R. at 545.) Lastly, in March 2020, Dunford complained of hand pain, but he reported he had been digging up a septic system the previous day. (R. at 542.) No physical examination was performed on that day, but Dr. McConnell continued him on pain medication. (R. at 544.) Thus, even when Dunford complained of hand and/or wrist issues, his examinations were normal. Moreover, Dr. McConnell treated him conservatively with medications. He did not refer Dunford to an orthopedic specialist, for injections or for a course of physical therapy. Moreover, in January 2019, consultative examiner Dr. Humphries noted tenderness to palpation of the left wrist; mild enlargement of some of the MCP and IP joints, but no hand tenderness; no motor or sensory loss of the extremities; full grip strength; intact radial, median and ulnar nerve function; and fine manipulation was performed adequately, despite an occasional fine tremor in the outstretched hands. (R. at 457.) Thus, although he found some abnormalities related to Dunford's left upper extremity, they were no more than mild. Dr. Humphries diagnosed degenerative joint disease of the hands, among other things. (R. at 457.)

With regard to his lower extremities, Dunford complained of left hip pain in September 2018, but an examination was normal, and hip x-rays showed suspicion of very early osteoarthritic change in the right hip. (R. at 380, 450, 452.) In October 2018, Dunford complained of left knee pain, but examination was, again, normal. (R. at 446, 448.) In November 2018, he complained of weather-related joint pain,

but examination revealed no extremity or joint tenderness, and there was no swelling, clubbing cyanosis or edema. (R. at 442, 444.) From December 2018 to February 2019, despite complaints of knee pain and his joints giving him "a fit," examinations remained normal, except for some joint tenderness. (R. at 495, 497, 501, 506.) In January 2019, Dunford advised Dr. Humphries he had experienced knee pain for about two years, with the right side being worse, and worsened by standing and walking. (R. at 455.) On examination, Dr. Humphries noted mild synovial thickening of the knee regions and mild enlargement of some of the IP joints; tenderness to palpation of the knees; no motor or sensory loss in the extremities; no atrophy and no asymmetric muscle wasting; a moderately antalgic gait on the right due to knee and lumbar discomfort; and give way on toe stand attempts and briefly heel stand; but he did not require an ambulation aid. (R. at 457.) Dr. Humphries did not make any diagnosis related to Dunford's knees. (R. at 457.) In March 2019, Dunford again reported the cold weather affected his joints, but, otherwise, he was doing "pretty good." (R. at 491.) From March 2019 through July 2019, the majority of physical examination findings related to his extremities and joints were normal, including no tenderness, swelling, cyanosis, clubbing or edema. (R. at 487, 493, 581, 585.) In August 2019, Dunford had tenderness in both knees, but no clubbing, cyanosis or edema, and right knee x-rays showed no significant abnormality. (R. at 577, 684.) From September through December 2019, examination findings of the lower extremities were normal. (R. at 558, 563, 573.) Examinations throughout 2020 remained normal with respect to Dunford's lower extremities. (R. at 524, 528, 532, 536, 538, 547-48, 551.) Although Dr. McConnell prescribed Dunford a cane on July 28, 2020, he did so only upon Dunford's request, stating he was "falling into stuff." (R. at 522.) Dr. McConnell stated he was prescribing the cane for balance when walking based on Dunford's lumbar spine and knee issues. (R. at 524-25.)

As with Dunford's left wrist/hand, the record shows that his examinations related to his lower extremities either were consistently normal or reflected no more than mild findings. Additionally, Dr. McConnell continued to treat him conservatively with medications. He did not refer Dunford to an orthopedic specialist, and he did not recommend or refer him for injections or for a course of physical therapy. Although he prescribed a cane in July 2020, this was at Dunford's request, and, in a February 2020 Medical Source Statement Of Ability To Do Work-Related Activities (Physical), Dr. McConnell opined a cane was not medically necessary. (R. at 518.) The court also notes the reports by Dunford that he was digging up a septic system in March 2020 and that he was trimming bushes on two separate occasions, once in June 2020, and again in July 2020, the same month he was prescribed the cane. Such activities are inconsistent with an individual incapable of performing sedentary work.

To the extent Dunford attempts to argue his medications affected his ability to perform sedentary work, he failed to properly develop this argument. In his brief, Dunford merely lists the medications he is taking, and he states they are for pain and sleep issues. (Plaintiff's Brief at 8.) This is a statement, not an argument, and the court declines to construct an argument on behalf of Dunford, who is represented by counsel. Furthermore, as outlined below, there is evidence in the record that Dunford did not take his pain medication as prescribed.

Dunford also argues that the ALJ erred by failing to list any jobs at the light exertional level that he could perform. However, as stated above, the ALJ found not that Dunford could perform the full range of light work, but that he retained the functional capacity to perform a range of sedentary to light work, and the representative jobs he found Dunford could perform, based on the vocational expert's testimony and existing in significant numbers in the national economy, all

were classified at the sedentary level of exertion. Thus, I find that substantial evidence supports the ALJ's decision that other jobs existed that Dunford could perform prior to July 2020. Substantial evidence does not, however, support the ALJ's decision for the period after July 2020. As stated above, the ALJ found that, beginning in July 2020, Dunford required a cane for balance. (R. at 17.) Furthermore, the vocational expert testified that, if Dunford was required to use a cane, all sedentary work was precluded. (R. at 60.) Therefore, I will remand based on the error on this issue. While it would be justified to remand for an award of benefits after this date, I will instead remand for further consideration in light of the evidence that suggests that Dunford was not taking his prescribed pain medication – hydrocodone but was testing positive for a narcotic pain medication that there is no evidence he was prescribed – oxycodone. This evidence would be relevant on any claim that Dunford has balance problems requiring the use of a cane.

An appropriate Order and Judgment will be entered.

DATED:      September 21, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE